**No. 25-11338**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff–Appellee,*

*v.*

STANFORD INTERNATIONAL BANK,

*Defendant,*

*v.*

RALPH S. JANVEY, RECEIVER; BAKER BOTTS L.L.P.; FTI CONSULTING, INCORPORATED; HOLLAND & KNIGHT, LLP; FINANCIAL INDUSTRY TECHNICAL SERVICES, INCORPORATED; BDO USA, L.L.P.; KRAGE & JANVEY, LLP; OSLER, HOSKIN & HARCOURT, LLP; PIERPONT COMMUNICATIONS, INCORPORATED; H. MALCOLM LOVETT, JR.,

*Appellants.*

On Appeal from the U.S. District Court for the Northern District of Texas, Dallas Division, No. 3:09-CV-00298-N

**JOINT OPENING BRIEF OF APPELLANTS RALPH S. JANVEY, RECEIVER; BAKER BOTTS L.L.P.; FTI CONSULTING, INCORPORATED; HOLLAND & KNIGHT, LLP; FINANCIAL INDUSTRY TECHNICAL SERVICES, INCORPORATED; BDO USA, L.L.P.; KRAGE & JANVEY, LLP; OSLER, HOSKIN & HARCOURT, LLP; AND H. MALCOLM LOVETT, JR.**

Aaron M. Streett
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855

Kevin M. Sadler
BAKER BOTTS L.L.P.
1011 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304
(650) 739-7500

Scott D. Powers
BAKER BOTTS L.L.P.
401 South 1st Street
Suite 1300
Austin, Texas 78704
(512) 322-2500

*Counsel for Appellants Ralph S. Janvey, Receiver; Krage & Janvey L.L.P.; Baker Botts L.L.P.; and H. Malcolm Lovett, Jr.*

(Additional counsel and parties listed on inside cover)

Kimberly A. Chojnacki
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
1301 McKinney Street, Suite 3700
Houston, Texas 77010
T: (713) 650-9700

Steven F. Griffith, Jr.
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
201 St. Charles Ave., Suite 3600
New Orleans, Louisiana 70170
T: (504) 566-5200

*Counsel for Appellant*
*FTI Consulting, Inc.*

Michael W. Stockham
HOLLAND AND KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
T: (214) 696-2515

*Counsel for Appellant*
*Holland and Knight LLP*

Lindsey Cohan
DECHERT LLP
106 E 6th St Suite 900-119
Austin, Texas 78701
T: (512) 394-3027

Allyson E. Riemma
DECHERT LLP
444 West Lake Street, Suite 2100
Chicago, Illinois 60606
T: (312) 646-5800

*Counsel for Appellant*
*BDO USA, P.C.*

Andrew B. Swallows
Daniel B. Rankin
BAKER BOTTS L.L.P.
401 South 1st Street, Suite 1300
Austin, Texas 78704
T: (512) 322-2500

*Additional Counsel for Appellants*
*Ralph S. Janvey, Krage & Janvey, L.L.P.,*
*Baker Botts L.L.P., and*
*H. Malcolm Lovett, Jr.*

Marianne W. Nitsch
Mark Stahl
GRAVES, DOUGHERTY, HEARON &
MOODY, PC
401 Congress Ave., Suite 2700
Austin, Texas 78701-3736
T: (512) 480-5757

*Counsel for Appellant*
*Osler, Hoskin & Harcourt LLP*

Cathy A. Fleming
FLEMING RUVOLDT, PLLC
779 Closter Dock Road
Closter, New Jersey 07624
T: (201) 518-7907

*Counsel for Appellant*
*Financial Industry Technical Services, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

| **Appellants:** | **Counsel for Appellants:** |
| --- | --- |
| Ralph S. Janvey, Receiver; Baker Botts L.L.P.; Krage & Janvey, L.L.P.; and H. Malcolm Lovett, Jr. | Kevin M. Sadler, Aaron M. Streett, Scott D. Powers, Andrew B. Swallows, and Daniel B. Rankin of Baker Botts L.L.P. |
| BDO USA, P.C. | Lindsay Cohan and Allyson E. Riemma of Dechert LLP |
| Financial Industry Technical Services, Inc. | Cathy A. Fleming of Fleming Ruvoldt, PLLC |
| FTI Consulting, Inc. | Kimberly A. Chojnacki and Steven F. Griffith of Baker Donelson Bearman Caldwell & Berkowitz, PC |
| Holland and Knight LLP | Michael W. Stockham of Holland and Knight LLP |
| Osler, Hoskin & Harcourt LLP | Marianne W. Nitsch and Mark Stahl of Graves, Dougherty, Hearon & Moody, PC |
| Pierpont Communications, Inc. | Robert T. “Terry” Sabom of Terry Sabom, Attorney-at-Law |

| **Appellee:** | **Counsel for Appellee:** |
|---|---|
| Securities and Exchange Commission | Morgan Bradylyons and Jason Jeffrey Rose of the Securities and Exchange Commission |

Dated: March 23, 2026

*/s/ Kevin M. Sadler*
Kevin M. Sadler

*Counsel of Record for Appellants*
*Ralph S. Janvey, Krage & Janvey, L.L.P.,*
*Baker Botts L.L.P., and H. Malcolm Lovett, Jr.*

## STATEMENT REGARDING ORAL ARGUMENT

Although the few issues in this appeal are straightforward and the district court's abuse of discretion is clear, the underlying record is voluminous, and the underlying proceedings span almost two decades. Appellants respectfully submit that argument may assist the Court in analyzing the record and context for the district court's order, which addressed the final resolution of more than eighty fee applications spanning the past sixteen years.

## TABLE OF CONTENTS

Certificate of Interested Persons ........................................................................ iii

Statement Regarding Oral Argument ......................................................................v

Table of Authorities ............................................................................................ viii

Jurisdictional Statement .........................................................................................1

Statement of Issues..................................................................................................2

Introduction .............................................................................................................3

Statement of the Case..............................................................................................7

I. Factual Background..........................................................................................7

A. The district court appoints a receiver to manage the Stanford Estate. .........................................................................7

B. Through more than sixteen years of work by the Receiver and his professionals, Receivership recoveries surpass $2.8 billion, with $2.18 billion distributed to investors.............9

C. The district court holds back a portion of the professionals' fees and out-of-pocket expenses. .......................14

D. The district court consistently approves the professionals' rates and fee applications, subject to a holdback that eventually approaches $30 million. ...................15

II. Procedural History .........................................................................................17

Summary of Argument .........................................................................................23

Standard of Review................................................................................................25

Argument...............................................................................................................26

A. The district court's downward departure from the lodestar was error. ..................................................................26

1. The district court repeatedly—more than eighty times—determined that the Receiver's and his professionals' fees were reasonable. ..............................27

2. An adjustment to the lodestar is only permitted when it is based on permissible *Johnson* factors............31

3. The district court's downward departure from the lodestar was not based on any *Johnson* factor. ..............32

4. The district court's other reasons for departing downward from the lodestar were equally erroneous....................................................................41

5. The district court's conclusory nod to the *Johnson* factors does not save the order. .....................................45

B. The District Court erred by failing to adjust the held-back amounts for delay in payment.................................................46

1. Given the sixteen years' worth of delayed payment, a CPI-based adjustment was necessary to ensure the fees awarded were reasonable.......................46

2. The Receiver's request that the district court adjust the holdback using the CPI-U South was appropriate, and neither the SEC nor the Examiner objected to this method.................................................48

3. The district court's refusal to make a CPI-based adjustment to the held-back fees was legally erroneous....................................................................50

C. The district court erred in refusing to compensate Baker Botts for preparing the Receivership's numerous and detailed fee applications..........................................................53

Conclusion ..........................................................................................57

Certificate of Service ..........................................................................60

Certificate of Compliance ....................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Baker Botts L.L.P. v. ASARCO LLC*,
576 U.S. 121 (2015)....................53

*Barron v. Countryman*,
432 F.3d 590 (5th Cir. 2005)....................36

*Blum v. Stetson*,
465 U.S. 886 (1984)....................33

*CH Offshore, Ltd. v. Mexiship Ocean CCC S.A. de C.V.*,
163 F.4th 171 (5th Cir. 2025)....................35

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978), *superseded by rule on other grounds*,
Fed. R. Civ. P. 23(f)....................1

*Copeland v. Marshall*,
641 F.2d 880 (D.C. Cir. 1980)....................46

*Cruz v. Maverick County*,
957 F.3d 563 (5th Cir. 2020)....................25, 43

*Graves v. Barnes*,
700 F.2d 220 (5th Cir. 1983)....................46, 47, 51

*Heidtman v. County of El Paso*,
171 F.3d 1038 (5th Cir. 1999)....................32

*In re DAK Indus.*,
66 F.3d 1091 (9th Cir. 1995)....................39

*In re Fender*,
12 F.3d 480 (5th Cir. 1994)....................32, 46

*In re H.L.S. Energy Co., Inc.*,
151 F.3d 434 (5th Cir. 1998)....................38, 39

*In re Hunt*,
196 B.R. 356 (N.D. Tex. 1996) ........................................................................40

*In re Lawler*,
807 F.2d 1207 (5th Cir. 1987) .........................................................27, 47, 51, 52

*In re Midway Airlines, Inc.*,
383 F.3d 663 (7th Cir. 2004) ..........................................................................37

*In re Nat'l Gypsum Co.*,
123 F.3d 861 (5th Cir. 1997) ..........................................................................40

*In re Pilgrim's Pride Corp.*,
690 F.3d 650 (5th Cir. 2012) ............................................. 26, 27, 31, 32, 45, 50

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ........................................................................7, 44

*Janvey v. Alguire*,
No. 3:09-CV-00724-N, 2014 WL 12654910 (N.D. Tex. July 30, 2014),
*aff'd*, 847 F.3d 231 (5th Cir. 2017) (per curiam)................................................39

*Janvey v. Brown*,
767 F.3d 430 (5th Cir. 2014) ..........................................................................50

*Janvey v. GMAG, L.L.C.*,
925 F.3d 229 (5th Cir. 2019) (per curiam), *certified question answered*, 592 S.W.3d 125 (Tex. 2019) ......................................................36, 37

*Johnson v. Ga. Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) ................. 4-5, 14-18, 20-24, 27, 31-36, 40, 42-45

*Latvian Shipping Co. v. Baltic Shipping Co.*,
99 F.3d 690 (5th Cir. 1996) ............................................................................26

*Lonchar v. Thomas*,
517 U.S. 314 (1996)........................................................................................35

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)........................................................................................55

*Martin v. Franklin Capital Corp.*,
546 U.S. 132 (2005)........................................................................................27

*McKinney ex rel. NLRB v. Creative Vision Resources, L.L.C.*,
783 F.3d 293 (5th Cir. 2015) ....................................................................26

*Missouri v. Jenkins ex rel. Agyei*,
491 U.S. 274 (1989)......................................................................46, 47, 48

*Nkenglefac v. Garland*,
64 F.4th 251 (5th Cir. 2023) ......................................................................49

*OSIC v. Am. Lebanese Syrian Associated Charities*,
No. 3:11-CV-0303-N, 2015 WL 13739835 (N.D. Tex. July 22, 2015).............39

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
478 U.S. 546 (1986)..............................................................................33, 45

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*,
90 F.3d 1307 (7th Cir. 1996) ................................................................36, 44

*Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542 (2010)......................................................................28, 48, 49

*Rose Pass Mines, Inc. v. Howard*,
615 F.2d 1088 (5th Cir. 1980) (per curiam) .........................................54, 55, 56

*Saizan v. Delta Concrete Prods. Co.*,
448 F.3d 795 (5th Cir. 2006) (per curiam) ......................................26, 30, 32, 43

*Schwarz v. Folloder*,
767 F.2d 125 (5th Cir. 1985) ......................................................................26

*SEC v. Forex Asset Mgmt. LLC*,
242 F.3d 325 (5th Cir. 2001) ........................................................................1

*SEC v. Megafund Corp*.,
No. 3-05-CV-1328-L, 2007 WL 1099640 (N.D. Tex. Feb. 14, 2007)...............50

*SEC v. Stanford Int'l Bank, Ltd.*,
112 F.4th 284 (5th Cir. 2024) ........................................................................7

*SEC v. Stanford Int'l Bank, Ltd.*,
927 F.3d 830 (5th Cir. 2019) ......................................................................38

*SEC v. Stanford Int'l Bank, Ltd.*,
Nos. 3:09-CV-0298-N, 3:09-CV-0721-N, 2009 WL 10704900
(N.D. Tex. May 15, 2009) ....................................................................38

*SEC v. W. L. Moody & Co., Bankers (Unincorporated)*,
374 F. Supp. 465 (S.D. Tex. 1974), *aff'd*, 519 F.2d 1087 (5th Cir. 1975)
(unpublished table decision) ....................................................................53

*Soler v. G & U, Inc.*,
801 F. Supp. 1056 (S.D.N.Y. 1992) ....................................................48, 49, 54

*Torres v. SGE Mgmt., L.L.C.*,
945 F.3d 347 (5th Cir. 2019) ....................................................................35

*U.S. Leather, Inc. v. H & W Partnership*,
60 F.3d 222 (5th Cir. 1995) ....................................................31, 32, 36

*United States v. Lipscomb*,
299 F.3d 303 (5th Cir. 2002) ....................................................................26

*United States v. Petters*,
No. 08-5348, 2021 WL 3883392 (D. Minn. July 29, 2021), *aff'd sub nom.*, *United States v. Kelley*, 70 F.4th 482 (8th Cir. 2023)........................33

*Walker v. U.S. Dep't of Hous. & Urb. Dev.*,
99 F.3d 761 (5th Cir. 1996) ....................................................................48

*Watkins v. Fordice*,
7 F.3d 453 (5th Cir. 1993) ....................................................................31

*Zacarias v. Stanford Int'l Bank, Ltd.*,
945 F.3d 883 (5th Cir. 2019) ....................................................................7

**STATUTES**

11 U.S.C. § 328....................................................................38, 40

11 U.S.C. § 330(a)(6)....................................................................55

11 U.S.C. § 331....................................................................40

11 U.S.C. § 503(b)(1)....................................................................38

11 U.S.C. § 507(a)(1)....................................................................38

11 U.S.C. § 704(a) ....................38

11 U.S.C. § 726(a) ....................38

**OTHER AUTHORITIES**

1 *Kings* 3 ....................21

3 Ralph Ewing Clark, *Treatise on the Law and Practice of Receivers* § 667 (3d ed. 1959) ....................50

*In re Prospect Med. Holdings, Inc.*, No. 25-80002-sgj11 (Bankr. N.D. Tex. Feb. 12, 2025), Dkt. 608 ....................40

*In re Prospect Med. Holdings*, No. 25-80002-sgj11 (Bankr. N.D. Tex. Apr. 27, 2025), Dkt. 1663 ....................40

*In re Prospect Med. Holdings, Inc.*, No. 25-80002-sgj11 (Bankr. N.D. Tex. May 22, 2025), Dkt. 2066 ....................40

*Rotstain v. Trustmark Nat'l Bank*, No. 4:22-cv-00800 (S.D. Tex. Mar. 14, 2022), Dkt. 1159 ....................42

*SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N (N.D. Tex. Mar. 9, 2026), Dkt. 3573 ....................19

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under the collateral-order doctrine. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978), *superseded by rule on other grounds*, Fed. R. Civ. P. 23(f). The district court's decision to deny reasonable compensation to the Receiver and his professional firms is conclusive and separate from the merits of the SEC's case against Stanford and the Stanford Entities. Orders on the distribution of receivership assets are "effectively unreviewable on appeal because the assets from the receivership will be distributed, and likely unrecoverable, long before the action brought by the SEC is subject to appellate review." *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 330 (5th Cir. 2001).

## STATEMENT OF ISSUES

Whether the district court erred by failing to award reasonable fees and expenses to the Receiver and his professionals for sixteen-plus years during their work on this Receivership, when it withheld, throughout the life of the Receivership, a portion of the Receivership's fees and expenses pending the Receivership's final results and then ultimately declined to award those fees and expenses based on "equitable" considerations that were not permitted or supported by legal authority.

1. Sub-issue: Whether the district court's failure to award the full amount of fees and expenses held back over sixteen years constituted an arbitrary downward departure from the lodestar contrary to established precedent and the undisputed record evidence.

2. Sub-issue: Whether the district court's failure to approve an upward adjustment to the withheld fees and expenses to compensate for the multiyear delay in payment was contrary to the established law in this Circuit.

3. Sub-issue: Whether the district court erred by failing to award Baker Botts any compensation for 5,678 hours spent over sixteen years preparing the Receivership's detailed fee applications.

## INTRODUCTION

This appeal arises from the long-running Receivership created in the wake of Robert Allen Stanford's multibillion-dollar Ponzi scheme. In February 2009, Ralph Janvey (the "Receiver") was appointed as the Stanford Estate's receiver. Upon his appointment, the Receivership had access to only $63 million in readily available cash with which to address an Everest-sized mountain of work and billions of dollars in liabilities. In the sixteen-plus years since, the Estate has been transformed. Recoveries have exceeded $2.8 billion, and the Receiver has distributed $2.18 billion directly to investors harmed by Stanford's fraud. The Estate's financial success required arduous, complex, and extensive work by the Receiver and his professionals. That work was also, of course, compensable. Yet not all that work was compensated at the time it was performed due to an anomalous process the district court imposed on the Receivership beginning in 2009.

Throughout the Receivership, the district court consistently approved the time spent and hourly rates of the Receiver and his professionals—rates that have always been substantially discounted. But, from each of the Receiver's eighty-plus fee applications, the district court withheld a portion of the requested fees and expenses, amounts adding up to almost $30 million in professional fees and expenses owed to both the Receiver and more than forty professional firms who assisted him. The district court justified this "holdback" solely because, in its view, the "results

obtained" *Johnson* factor for evaluating professional fees, *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974), could not be fully evaluated until the "eventual size" of the Receivership was determined. Indeed, the district court, echoing the SEC's initial concerns, seemed uncertain whether the Receiver would be able to recover sufficient assets to make *any* distribution to Stanford's victim investors. But sixteen years later, no uncertainty remains: the Receiver recovered an extraordinary $2.8 *billion*.

Once the Receiver and his professionals substantially completed their asset-recovery work, they requested (1) payment of the $29.4 million in held-back fees and expenses, together with an adjustment for the cost of many years' delay in payment, and (2) sought compensation for the Receiver's lead counsel, Baker Botts, for its work preparing the Receivership's detailed fee applications throughout the life of the Receivership.

The district court denied the bulk of the Receiver's request. In a brief and sparsely reasoned order, the district court approved payment of only one-half of the withheld fees and expenses, denied any delay adjustment, and rejected any compensation for preparing the Receiver's numerous, detailed fee applications. The district court eschewed any meaningful discussion of *Johnson*'s "results obtained;" nor did it revisit its earlier decisions that the professionals' hourly rates and time spent were reasonable. The district court instead based its arbitrary fifty-percent cut

on the perceived "equity" of increasing payments to investors by reducing compensation owed to professionals. This reduction effected a substantial downward departure from the lodestar—the presumptive reasonable fee—for sixteen years of work that contributed to "results obtained" beyond anyone's expectations. Using a rationale divorced from *Johnson* and the legal standard, the district court determined that the downward departure was necessary to "mitigate the harm to the victims," improperly equating compensation earned by the Receiver and his professionals to the "harm" caused by Stanford's fraud scheme.

Employing a similar rationale, the district court denied the Receiver's request that the district court adjust the held-back amounts to compensate for the lengthy delay in payment. The district court declined to apply the correct legal standard—considering whether a delay adjustment was appropriate to award a reasonable fee—and instead erroneously posited that because Stanford's victims received no time-delay adjustment for their losses, the Receiver and his professionals should receive no such adjustment either. But that comparison finds no basis in the law. Recoverable compensation to victims of Ponzi schemes and compensation to court-appointed professionals whose work makes that compensation possible are governed by entirely different legal standards.

Contrary to precedent and the undisputed record evidence, the district court also denied any compensation to the Receiver's counsel, Baker Botts, for preparing

sixteen-years' worth of lengthy, detailed fee applications on behalf of the Receiver and more than forty other professional firms. The district court's sole justification for its decision was the SEC's position that a receiver's work to prepare fee applications is not compensable. But the SEC's position is unsupported by legal authority, and in any event has no bearing on the propriety of compensating the Receiver's counsel for its service to the Receivership Estate in creating the detailed, legally required fee applications to assist the district court in understanding the Receivership's work.

The district court's three distinct errors arbitrarily denied the Receiver and his professionals their reasonable fees and expenses. Because the applicable law is clear and there is no evidentiary dispute that the rates charged or the vast volume of work performed were reasonable, this Court should reverse and render an award in the Receiver's requested amounts. Such a ruling is necessary to properly compensate the Receiver and his professionals for their work performed for the Estate and the benefit of Stanford's thousands of investors.

## STATEMENT OF THE CASE

### I. Factual Background

The infamous Ponzi scheme perpetrated by Robert Allen Stanford and his co-conspirators was one of the largest financial frauds in U.S. history. Although the SEC believed as early as 1997 that Stanford's too-good-to-be-true investment program was likely a Ponzi scheme, it waited until February 2009 to sue Stanford, by which time his fraud had grown to catastrophic proportions—$5 billion in losses to more than 30,000 investors worldwide.[1] The details and scope of Stanford's fraudulent scheme are well documented, and its aftermath has generated extensive litigation and numerous appeals to this Court.[2]

#### A. The district court appoints a receiver to manage the Stanford Estate.

On February 17, 2009, the SEC sued Stanford in the Northern District of Texas for securities fraud. ROA.552. At the SEC's request, the district court took immediate, exclusive jurisdiction over Stanford's assets, placed them in receivership, and appointed Ralph S. Janvey as the Receiver. ROA.648-49.

---

[1] ROA.34175 (SEC OIG Report finding "that the SEC's Fort Worth office was aware since 1997 that Robert Allen Stanford was likely operating a Ponzi scheme, having come to that conclusion a mere two years after SGC, Stanford's investment adviser, registered with the SEC in 1995.").

[2] *See generally, e.g.*, *SEC v. Stanford Int'l Bank, Ltd. ("SIBL")*, 112 F.4th 284 (5th Cir. 2024); *Zacarias v. SIBL*, 945 F.3d 883 (5th Cir. 2019); *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011).

The Receiver's task was enormous. The Stanford Estate consisted of more than 130 entities with over 200 different internal accounting systems, 70 offices in 23 states and 13 foreign countries, thousands of employees, and more than 300 bank accounts spread over 100 financial institutions. *See* ROA.6345-47, 6400. The Receiver was required to bring this vast Estate under control; take charge of the operations, investments, and records of the many Stanford entities; manage thousands of those entities' employees; steward hundreds of millions of dollars in third-party investments; liquidate assets ranging from real estate to airplanes and yachts; and comply with requests for information from state and federal authorities. ROA.6346-49. Predictably, too, the Receivership itself became the hub of intense and prolonged litigation involving far-flung Stanford assets that the Receiver was charged to marshal and safeguard for the benefit of the defrauded investors. *See* ROA.6348.

The Receiver could not do it all alone. Recognizing as much, the district court authorized the Receiver to hire "managers, agents, custodians, consultants, investigators, attorneys, and accountants as [the] Receiver judges necessary to perform the duties set forth in this Order." ROA.652. The Receiver was also directed to "compensate them from the Receivership Assets." ROA.652. The Receiver accordingly hired a team of professional firms with multidisciplinary skills and expertise in areas such as finance, brokerage, bankruptcy, receivership, tax,

fraud, and complex litigation to help him manage, administer, and (where possible) grow the Stanford Estate for the benefit of the defrauded investors. *See* ROA.6360-82.

But that was just the start. When these professionals began their work for the Receiver to remediate the effects of the historically large Ponzi scheme, the financial status of the Stanford empire was precarious. In the months leading up to the Receivership, Stanford's scheme had been hemorrhaging cash,[3] leaving the Receiver facing a bleak financial picture. With a monumental task ahead and facing billions of dollars of liabilities, the Receiver had access to only $63 million in readily available cash when the Receivership began. ROA.99547. The Receiver and his professionals formulated a long-term strategy to turn around the Estate's financial fortunes and, per the district court's order, preserve and recover assets for the benefit of the thousands of defrauded investors. *See* ROA.99550.

### B. Through more than sixteen years of work by the Receiver and his professionals, Receivership recoveries surpass $2.8 billion, with $2.18 billion distributed to investors.

By any measure, the Receivership has been a remarkable success. From February 2009 to August 2025, the Receiver and his professionals skillfully discharged their duties on multiple fronts:

---

[3] From October 2008 to February 2009, the Stanford entities burned through more than $1 billion in cash. *See* ROA. 34072-74.

- *Estate administration*. The Receiver and his professionals worked to wind down a sprawling international empire of more than 130 entities, 300 bank accounts, and thousands of employees, that was losing vast sums of money each month. ROA.104698.
- *Litigation*. The Receiver's counsel prosecuted lawsuits against third parties who received fraudulent transfers and against banks, insurance brokers, law firms, net winners, and former Stanford financial advisors who assisted or benefited from Stanford's fraud. Collectively, these lawsuits yielded over $2.3 billion for the Estate. *See* ROA.103638.
- *OSIC*. The Receiver and his professionals spent tens of thousands of hours assisting the Official Stanford Investors Committee ("OSIC") in litigation. *See, e.g.*, ROA.96166 (more than 3,000 hours in February 2023 alone).[4] The Examiner, John Little, was appointed as the chairperson of the Committee. ROA.25020. Pursuant to the district court's order, the Receiver and OSIC were directed to, among other things, "cooperate in the identification and prosecution of actions and proceedings for the benefit of the Receivership Estate and the Stanford Investors." ROA.25023. The Receiver's and professionals' work

[4] OSIC is a committee that was created by the district court to represent the interests of the defrauded investors. *See* ROA.25019.

assisting OSIC was tracked and billed separately and approved by the district court in dozens of fee applications, all without objection. *See, e.g.*, ROA.95809 (motion, unopposed); ROA.95930-31 (appendix showing separately tracked work); ROA.96689-90 (order approving). As part of the professionals' work assisting OSIC, Baker Botts served, at OSIC's request, as OSIC's lead trial counsel and sole settlement negotiator for the cases that resulted in $1.6 billion in recoveries for the Receivership; FTI performed forensic analyses that served as the basis for damages models and expert testimony; and Karyl Van Tassel's work through various professional firms established that the Stanford entities were operated as a Ponzi scheme from their inception—a determination that undergirded all of the Receiver's and OSIC's litigation efforts. ROA.99570-72.

- *Claims and distribution work*. The Receiver and his professionals developed a claims and distribution process, analyzed Receivership records and claimant information to make determinations on claims submitted by defrauded investors, evaluated objections to those determinations, and handled fraud-prevention issues arising from the claims process. *See* ROA.99569-70, 99573, 99575-76.

- *Receivership management*. Throughout the Receivership, the Receiver and his professionals employed record-keeping protocols, handled the large amounts of cash going in and out of the Estate, processed all invoices submitted to the Receivership, reviewed competing bids for vendor services, preserved files on the Receivership's servers, oversaw the move of the Receivership's operations in St. Croix (where Stanford resided), managed real estate and personal property owned by the Receivership, and catalogued and liquidated all of that property. *See* ROA.99559-60, 99570.

- *Investigation and accounting*. The Receiver and his professionals conducted extensive forensic and tax accounting. This entailed, among other things, tracing assets, gathering company books and records, analyzing electronic and documentary evidence, preparing combined balance sheets for the Stanford entities, and extensively interviewing Stanford personnel. *See* ROA.99573-74.

- *Government production*. The Receiver and his professionals worked with state and federal agencies, including the SEC, DOJ, FBI, IRS, and many others, to produce requested information and documents. This entailed, for example, imaging hard drives of certain custodians, responding to subpoenas, and searching email files of former Stanford

employees. The information and documents provided were instrumental in the criminal prosecutions of Stanford and his associates and in obtaining relief against other Stanford personnel who violated federal securities laws. *See* ROA.99568-69, 99572.

- *Fee applications*. To coordinate the process of compensating the Receiver and more than forty professional firms for their work, Baker Botts spent nearly 6,000 hours over sixteen years working to prepare scores of lengthy and detailed fee applications on behalf of all the Estate's professionals. This process ensured that all the professionals' invoices adhered to uniform, proper standards for billing, properly redacted certain information for public filing, and appropriately summarized the ongoing work of the Receiver for the district court. It likewise ensured that the district court was not inundated with forty-plus firms submitting hundreds of individual fee applications over the life of the receivership. *See* ROA.99609-10, 99620-963.

In summary, the Receiver and his professionals were able to reverse the flow of cash out of the Estate, wind down and liquidate the sprawling Stanford empire, and grow the Estate through successful asset recovery and tort litigation against hundreds of third parties who assisted or benefited from the Stanford Ponzi scheme.

As of the time of the order on appeal, the Receivership Estate had collected $2.82 billion in cash inflows, distributed more than $1.8 billion to Stanford's victims, and was preparing to execute a final distribution of an additional $375 million to those same investors. *See* ROA.103637, 105514. The defrauded investors will recover over 47% of their net losses thanks to the Receivership's efforts. ROA.104249, 106510-11.

### C. The district court holds back a portion of the professionals' fees and out-of-pocket expenses.

In its order appointing the Receiver, the district court stated that the professionals were to be paid "reasonable fees." ROA.653. The district court's initial order also established the ground rules for obtaining compensation: compensation would be paid from assets of the estate, and the district court would assess the reasonableness of professional fees under the *Johnson* factors upon submission of periodic fee applications. *See* ROA.653.

In his first fee application, the Receiver and his professionals agreed to discount their standard rates by twenty percent. *See* ROA.6344. Nevertheless, the SEC criticized some of the billing by the Receiver's professionals and requested that the district court temporarily withhold twenty percent of the already discounted fees and twenty percent of the firms' actual out-of-pocket expenses until the ultimate size of the Receivership Estate could be ascertained. ROA.7240. While the district court ultimately agreed that the rates charged by the Receiver and his professionals were

indeed reasonable, ROA.19232, it imposed the twenty percent holdback that the SEC had requested in light of the uncertain financial condition of the Estate *at that time*, ROA.106702:16-22.

Writing about the holdback, the district court acknowledged that the *Johnson* factors that could be ascertained at that point "suggest that the Receiver's and Examiner's fees are reasonable," including "the substantial time and labor involved with unraveling such a complex scheme; the novelty and difficulty of many of the legal questions to be addressed; the skill requisite to perform the services in question; and the experience, reputation, and ability of the attorneys and other professionals involved." ROA.19232. But the district court deemed the SEC's requested holdback "appropriate at this time" because "it is increasingly clear that the eventual size of the receivership estate will be smaller than initially hoped or expected." ROA.19232. Thus, the district court based the holdback on its provisional assessment of the "amount involved and the results obtained" *Johnson* factor, but invited the Receiver to "apply" for the amounts withheld "at a later date." ROA.19232-33.

### D. The district court consistently approves the professionals' rates and fee applications, subject to a holdback that eventually approaches $30 million.

From 2009 until the order under review, a total of eighty-two fee applications had been submitted to and approved by the district court, each subject to a holdback

of 10% to 35%. *See, e.g.*, ROA.19233, 101830.[5] Baker Botts, the Receiver's lead counsel, prepared and submitted fee applications for all forty-four of the Receiver's professional firms, requesting fees and expenses for the time spent at the Receivership's discounted and court-approved rates. ROA.104296. Those applications summarized the professionals' activities corresponding to more than 540,000 hours of work over sixteen years and were accompanied by tens of thousands of pages of detailed invoices that identified the time spent and tasks performed by the professionals. *See* ROA.104295.

The district court approved each one of the Receiver's eighty-two fee applications, expressly stating that the fees and expenses requested in those applications were reasonable. The district court's order approving the eighty-second fee application is representative of all the others: "Because the Court finds the request reasonable under the factors outlined in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), and in line with the Court's previous fee application guidance, . . . the Court grants the motion." ROA.101829[6]; *see also*

[5] In 2012, for example, the Receiver asked the district court to reduce the holdback percentage going forward from 20% to 10% in light of the increasing health of the Estate. ROA.38236-39. The district court summarily granted the motion without further analysis of the *Johnson* factors. ROA.38615.

[6] After this appeal was filed, the district court approved the Receivership's eighty-third fee application. ROA.106552-53. That order contained the same language and citation to *Johnson* regarding the Receivership's fees and expenses,

ROA.32917-19 (explaining that the court "has reviewed the Receiver's fee applications and ultimately found that each claimed an amount justified under the fee review factors outlined in *Johnson*").

In 2014, the Receiver requested that the district court release one-third of the withheld amounts to the Receivership's professionals in light of the Receivership's improved financial circumstances. ROA.53679-80. The SEC opposed on the ground that the district court should wait "to consider what result the receivership generated for investors." ROA.54478. The district court denied the Receiver's request as "premature." ROA.396 (Electronic Order, Dkt. 2033).

By the time of the order on appeal, almost $30 million in accrued fees and expenses had been withheld as a result of the holdback instituted by the district court. ROA.104250. The Receivership's professionals' total compensation of approximately $218 million (if the holdback request were paid in full) represents less than 8% of the more than $2.8 billion in recoveries that benefited investors. *See* ROA.99554 & n.5.

## II. Procedural History

By October 2024, the Receiver concluded that the ultimate "results obtained" had become clear. Based on those results, the Receiver moved the district court to

---

but, with the acquiescence of the Examiner and SEC, did not impose any holdback. ROA.106552-53.

(1) release all the fees and expenses withheld from the first eighty-one fee applications, (2) allow compensation to Baker Botts for its work preparing the fifth through eighty-first fee applications, and (3) apply a CPI-based adjustment to the requested amounts to compensate for the multiyear delay in payment. ROA.99542-91.

The Examiner, OSIC, and SEC each opposed the Receiver's request. *See* ROA.100397-423, 100455-71. They asserted without citation to evidence or precedent that it would be more "equitable" to redistribute all the withheld fees and expenses to the investors. *See, e.g.*, ROA.100467. Rather than addressing the *Johnson* factors in general or the "results obtained" factor in particular, the SEC and Examiner requested that the district court "favor" the investors because doing so would be more "meaningful." ROA.100407, 100422. They also argued that the Receiver's professionals should not be given all of the credit for the Receivership's recoveries. ROA.100411-13. The district court summarily denied the Receiver's request, again calling it "premature." ROA.101148-49.

Almost a year later, following resolution of the two remaining asset-recovery lawsuits, the Receiver filed a motion for final distribution of approximately $420 million of the Receivership's assets. ROA.104246-85. The Receiver proposed that

(1) $375 million of those funds go to investors,[7] and (2) approximately $43 million be disbursed to the Receiver and his professionals to satisfy the withheld payments and to compensate Baker Botts for its work preparing the fifth through eighty-second fee applications, subject to a CPI-based adjustment for the multiyear delay in payment. ROA.104247-48, 104250-51.[8]

The Receiver attached a several-hundred-page appendix that included the detailed declaration of the Receiver's lead counsel, Kevin M. Sadler. ROA.104291-99. This unrebutted evidence proves that the time spent and rates charged by each of the professionals were appropriate, necessary, and reasonable under the governing legal standards, just as the district court repeatedly held in granting each of the Receiver's fee applications. ROA.104292-95.

[7] The district court approved the Receiver's proposal to distribute $375 million to the Stanford investors. ROA.105513. Approximately $36 million of these funds were paid to one of Stanford's largest investors pursuant to a court-approved settlement. ROA.106510-11. The remaining $339 million is being distributed on a pro-rata basis to all the eligible Stanford investors. ROA.106511. The Receiver has since filed the schedule of final distribution payments, *see SEC v. SIBL*, No. 3:09-cv-00298-N (N.D. Tex. Mar. 9, 2026), Dkt. 3573, and is in the process of sending payments pursuant to the final distribution plan.

[8] The Receiver has reserved sufficient funds to make the requested payments in full and to execute wind-up tasks and administer the final distribution plan. ROA.105834.

The Examiner[9] and SEC opposed the Receiver's request for the payments to the Receiver and his professionals. ROA.104773-79, 104842-83. Neither the Examiner nor SEC's opposition included any evidence regarding the professionals' rates or time spent. The Examiner merely recycled the argument that the district court should "favor" the investors over the professionals. ROA.104775. And the SEC merely incorporated by reference its opposition to the Receiver's 2024 request, ROA.104842-43; *see* ROA.104844-62. Despite the numerous orders of the district court over the years approving the heavily discounted rates charged by the Receiver and the professional firms, the SEC objected to those rates solely by pointing to rates charged in smaller receiverships, which the SEC conceded were not comparable to Stanford. ROA.104853-56. The SEC did not challenge, or provide evidence regarding, the reasonableness of the professionals' time spent. *See* ROA.104853-56.

In a hearing on the motion, the Receiver argued that the withheld fees were part of the lodestar compensation to which the professionals are entitled given that (1) the district court had approved the hours spent and rates charged in over eighty fee applications under the *Johnson* factors, and (2) no one disputed $2.8 billion in

[9] The Examiner's opposition also purports to be OSIC's response, but that opposition makes clear only two of the five OSIC members, including the Examiner himself, voted to join. The other three members abstained. ROA.104773 & n.1.

total recovery was an exceedingly successful "result obtained" (the final *Johnson* factor, which was the basis of the provisional holdback). ROA.107642:15-107643:25. The Examiner and SEC, on the other hand, contended that the district court could allocate the held-back fees as a matter of "equity," without reference to the evidence or the legal standard governing professional compensation. *See* ROA.107649:8-9 ("SEC's position is essentially it's an equitable determination."). Indeed, the Examiner openly argued that "the focus on the *Johnson* factors is a little off the mark." ROA.107650:23-24. The Examiner claimed that the district court had unbridled discretion, notwithstanding the *Johnson* factors, to grant or deny "all the relief" the Receiver sought, "or [rule] pretty much anywhere in between." ROA.107650:10-12. The Examiner asked the district court to deny release of the holdback despite acknowledging that "Baker Botts," the "Receiver," and the "Receiver's professionals," performed "critical work" in the litigation that funded investor recoveries. ROA.107652:3-8. When the district court suggested that it could "split the baby," the Examiner affirmed that the court could "make a very Solomonic choice if—if that's where you want to go." ROA.107650:14-16.[10]

The district court accepted the SEC and Examiner's plea, applying a blunt, across-the-board 50% reduction to all the fees and expenses that had been withheld.

[10] The reference to the biblical story was particularly inapt as, of course, King Solomon did not "split the baby" in rendering his decision. 1 *Kings* 3:16-28.

ROA.105522-23 ("The Court awards fifty percent of the cumulative holdback."). To support this conclusion, the district court did not revisit its prior analysis of the *Johnson* factors or make an updated analysis of the "results obtained" factor in light of the record evidence. *See* ROA.105520-21. The court declared instead that the "reduced award is equitable," because "18,000 victims of a large and complex scheme have waited fifteen years to recover their losses," while "the Receiver and his professionals have collected on a significant percentage of the total amount recovered in the form of interim fees." ROA.105521. Citing no precedent for this rationale, the district court stated its belief that this "adjustment . . . will mitigate the harm the victims suffered." ROA.105521. The district court also characterized the adjustment as recognizing "the equitable role Baker Botts played in achieving the various Stanford settlements," but did not otherwise discuss the required non-litigation work or work performed by the other professional firms. ROA.105521. Nor did the district court explain its refusal to reimburse the out-of-pocket expenses in full. ROA.105521.

The district court also denied the Receiver's request for a CPI-based adjustment to the withheld fees and expenses and refused compensation to Baker Botts for thousands of hours of work preparing sixteen-years' worth of detailed fee applications. ROA.105521-22. The district court brushed aside the precedent supporting delayed-payment adjustment as involving "various fee-shifting cases

paid to *prevailing* counsel" and thus "inapplicable . . . where the recovery is shifted from the *victims*." ROA.105521-22 (emphases in original). And while it acknowledged that bankruptcy attorneys are compensated for preparing fee applications, the district court adopted the SEC and Examiner's argument that "SEC Billing Instructions provide that receivers cannot bill for time spent preparing and submitting fee applications." ROA.105522.

This appeal followed.[11]

## SUMMARY OF ARGUMENT

The district court abused its discretion in three ways by failing to award reasonable fees and expenses to the Receiver and his professionals.

*First*, the district court departed downward from the lodestar—the presumptively reasonable fee—for reasons unsupported by the record or the proper legal standard. The lodestar was established in orders granting the Receiver's eighty-two fee applications, each deeming the rates and time spent to be reasonable under the *Johnson* factors. The only evidence before the district court confirmed those conclusions. While the district court instituted the holdback in 2009 because the "results obtained" *Johnson* factor was uncertain at that time, no one could dispute

[11] This appeal is prosecuted by the Receiver who was responsible for requesting court approval of, and paying, the professionals' fees and expenses and whose request the district court denied, giving rise to this appeal. Nine of the Receivership's professional firms and professionals join the Receiver as co-appellants.

in 2025 that the $2.8 billion recovery constituted an extraordinary result. Thus, the evidence in the record could not support a downward departure from the lodestar based on any *Johnson* factor. And indeed, the district court did not rely on governing case law to justify its fee reduction.

Instead, at the invitation of the SEC and Examiner, the district court arbitrarily "split the baby" based on what it believed to be "equitable" and conducted an irrelevant *post hoc* evaluation of whether the Receiver's professionals deserved all the "credit" for the Receivership recoveries. But subjective determinations based on unbounded equitable discretion have never been a proper basis for departing from the lodestar. Worse yet, the district court's order was not equitable even on its own terms. Holding back fees and expenses for years in order to evaluate the Receivership's eventual results, and then cutting those held-back fees and expenses in half even after results exceeded all expectations, is demonstrably *in*equitable. The type of freewheeling "equity" power the district court exercised below is inconsistent with this Court's precedents, and the determination the court reached when wielding that power was unsupported by the evidence in the record.

*Second*, the district court erroneously refused to adjust the held-back fees and expenses to compensate the professionals for the years' delay in payment. It has long been the law of this Circuit, and the Supreme Court, that adjustment for delay in payment is part of a reasonable fee. The district court disregarded this authority

in part because, in its view, distributions to investors were not adjusted for delay in payment. But restitution payments to investors and compensation payments to professionals are governed by entirely different legal standards. Nor are delay adjustments limited to fee-shifting cases, cases where creditors are paid in full, or cases where larger percentages of compensation have been withheld.

*Third*, the district court abused its discretion by ruling that Baker Botts could not receive *any* payment for its extensive work preparing the Receivership Estate's fee applications. To reach that result, the district court ignored precedent from the analogous bankruptcy context in favor of the SEC's unsupported assertion that professionals should not be compensated for preparing a receivership's fee applications.

The district court failed to apply the correct legal standard when it decided to depart from the lodestar, justified that departure with irrelevant "equitable" factors of its own making, and disregarded applicable precedent and the record evidence in the process. Accordingly, this Court should reverse each of the district court's erroneous rulings and render judgment for the full amount of the withheld fees, adjusted for delay, along with compensation for preparing the fee applications.

## STANDARD OF REVIEW

Decisions regarding a professional's compensation are reviewed for abuse of discretion. *Cruz v. Maverick County*, 957 F.3d 563, 574 (5th Cir. 2020). An abuse

of discretion occurs when the district court applies incorrect legal standards, *Latvian Shipping Co. v. Baltic Shipping Co.*, 99 F.3d 690, 692 (5th Cir. 1996), considers the wrong factors when exercising discretion, *United States v. Lipscomb*, 299 F.3d 303, 339 (5th Cir. 2002), or makes decisions without reference to the evidence, *McKinney ex rel. NLRB v. Creative Vision Resources, L.L.C.*, 783 F.3d 293, 298 (5th Cir. 2015). "In ruling on motions for costs and attorney's fees, the district court cannot act arbitrarily. Discretionary choices are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Schwarz v. Folloder*, 767 F.2d 125, 127 (5th Cir. 1985) (citation modified).

## ARGUMENT

### A. The district court's downward departure from the lodestar was error.

Determining an appropriate fee for the professionals boils down to only one question: whether the requested fee is reasonable. This Court's precedents supply a clear framework for answering the question. The lodestar—the number of hours reasonably spent multiplied by a reasonable hourly rate—is the presumptively reasonable fee. *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 800 (5th Cir. 2006) (per curiam). The district court determined more than eighty times that the Receiver's professionals' rates and time spent were reasonable. Once the lodestar is calculated, courts have the "discretion to adjust the lodestar upwards or downwards to reflect their consideration of the *Johnson* factors." *In re Pilgrim's Pride Corp.*,

690 F.3d 650, 655 (5th Cir. 2012) (citing *In re Lawler*, 807 F.2d 1207, 1211 (5th Cir. 1987)). But "[d]iscretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005). Thus, this Court's established framework does not provide for arbitrary discretionary judgments divorced from the factors articulated in *Johnson*, 488 F.2d at 717-19.

The district court's downward departure from the lodestar in this case, effected through an arbitrary 50% across-the-board cut to the withheld amount, has no evidentiary or legal basis. The district court's stated rationale has no discernible connection to any *Johnson* factor, much less the "results obtained" factor that the district court cited as its sole reason for provisionally imposing the holdback sixteen years ago. Urged on by the SEC and the Examiner, the district court erroneously concluded that it held unrestrained equitable power to impose a downward departure from the lodestar. But the exercise of such arbitrary power cannot be reconciled either with this Court's precedents or with equity itself.

1. *The district court repeatedly—more than eighty times—determined that the Receiver's and his professionals' fees were reasonable.*

As a threshold matter, there is no dispute in this case regarding the calculation of the lodestar. The Receiver and his professionals worked more than half a million hours on the Receivership at substantially discounted hourly rates. At the time the

Receiver moved for release of the holdback, the lodestar figure for that work included the $29,833,810.90 in withheld fees and expenses that are the subject of this appeal. ROA.104657, 107643:7-14, 107646:19-21. The "presumptively" reasonable fee in this years-long case thus includes full payment of the withheld amount. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552-53 (2010).

In response to the Receiver's request that the district court award the held-back fees and expenses, no party challenged the reasonableness of the professionals' time spent. If anything, the district court's consistent statements over the sixteen years of the Receivership demonstrate why such a challenge would have been futile. The district court acknowledged "the substantial time and labor involved with unraveling such a complex [fraudulent] scheme," ROA.19232, and has "reiterate[d] . . . that the Receiver's professional fees and expenses generally have been spent gainfully and billed reasonably," ROA.32919. The Receiver's request to release the holdback was accompanied by the lengthy and detailed declaration of Receiver's lead counsel—unchallenged by the SEC—attesting to the reasonableness of the professionals' rates charged and time spent over the life of the Receivership. *See* ROA.104294-95. Given the district court's repeated approvals of the hours spent by the Receiver and his professionals, *see* ROA.107643:10-11 (Receiver's counsel stating without dispute at the hearing below that "[t]he hours have been approved more than 80 times" in fee applications), it is unsurprising that the Examiner and

SEC never challenged the Receiver's evidence in his motion for final distribution that the hours spent on the case were reasonable. The only evidence before the district court established that the time spent was reasonable and necessary. *See* ROA.104292-95. And nothing in any of the district court's orders, including the one prompting this appeal, says anything to the contrary.

It is much the same for the hourly rates. *See* ROA.107643:9-10 (Receiver's counsel stating without dispute at the hearing below that "[t]he Court has approved the rates more than 80 times in fee applications"). The Receiver and his professionals have substantially discounted their rates for the entire life of the Receivership, charging rates that were sometimes as little as half their standard hourly rates. ROA. 89936, 104294-95, 107646.[12] The fact that the Receiver and his professionals charged reasonable hourly rates is conclusively established by the record evidence.

The SEC asserted a token objection to the hourly rates of Baker Botts, the Receiver's lead counsel, in the SEC's opposition to the Receiver's 2024 request to

[12] It bears noting that even though the professionals' rates charged to private clients increased year to year, the professionals did not request a concomitant increase each year from the district court. *See, e.g.*, ROA.89935, 104294. So not only were the Receiver and his professionals always working at discounted rates, but they were also frequently working at discounted rates that were outdated, creating a compounded discount when compared to contemporaneous work performed for other clients. The holdback, of course, was on top of this compounded discount.

release the held-back funds. *See* ROA.100462-65. But the SEC provided no serious support for its objection, offering only a handful of citations to cases involving vastly smaller receiverships. *See* ROA.104853-56. A review of comparably complex work charged by comparably sized law firms revealed that Baker Botts charged rates that were significantly *below* market rate. *See* ROA.101068-69. In any event, the district court did not credit the SEC's argument on this score, and rightly so: the district court approved the professionals' rates each time it approved the fee applications, and explicitly pre-approved the rates charged by the professionals. *See* ROA.90473. After eighty-plus approved fee applications, the ship had long sailed on challenging the professionals' rates, and there is no material dispute as to the reasonableness of those rates.

With no dispute as to the reasonableness of the time or rates, there is no dispute regarding the lodestar. Each of the fee applications requested approval and payment of the reasonable hours for the period of that application at the reasonable rates already approved by the district court. *See, e.g.*, ROA.101209-10. Thus, the amount requested in each fee application *was* the lodestar. As this Court has observed time and again, "[t]here exists a strong presumption of the reasonableness of the lodestar amount." *Saizan*, 448 F.3d at 800.

### 2. *An adjustment to the lodestar is only permitted when it is based on permissible* Johnson *factors.*

The district court's order offers no justification for any downward departure from the lodestar, much less an arbitrary 50% across-the-board cut to the held-back amount. When departing upward or downward from the lodestar, a court must consider the twelve *Johnson* factors:

> (1) the time and labor required to represent the client or clients; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 800 n.18 (citing *Johnson*, 488 F.2d at 717-19).

"[A]fter calculating the lodestar," courts may then "adjust the lodestar up or down based on [their] . . . consideration of the twelve factors listed in *Johnson*." *Pilgrim's Pride*, 690 F.3d at 660. But because "the lodestar is presumptively reasonable," any adjustment to it must be "*necessary* to make the award of attorneys' fees reasonable." *Watkins v. Fordice*, 7 F.3d 453, 459 (5th Cir. 1993) (emphasis in original). To the extent a court deems such a departure necessary, it must base that departure upon one of the *Johnson* factors. A court has no discretion to rely upon anything else. As this Court put it in *U.S. Leather, Inc. v. H & W Partnership*, "[t]he

court is limited in its discretion only by the considerations espoused in *Johnson*." 60 F.3d 222, 229 (5th Cir. 1995).

That discretion, moreover, is further circumscribed by the fact that the lodestar already accounts for some of the *Johnson* factors. Indeed, the lodestar "is presumed to fully account for four of the twelve *Johnson* factors—'the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, and the results obtained from the litigation.'" *Pilgrim's Pride*, 690 F.3d at 659 (quoting *In re Fender*, 12 F.3d 480, 488 (5th Cir. 1994)). So if the lodestar has already been calculated, as it has been in this case, any departure from it based on one of the four *Johnson* factors subsumed by it would be error. "The lodestar may not be adjusted due to a *Johnson* factor . . . if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting." *Saizan*, 448 F.3d at 800. Simply put, those four factors "cannot serve as independent bases" for adjusting the fee award. *Heidtman v. County of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999) (citation omitted).

3. *The district court's downward departure from the lodestar was not based on any* Johnson *factor.*

The district court identified none of the *Johnson* factors in making its final downward departure. Indeed, these principles of lodestar adjustment, all established to guide and limit a court's discretion when determining whether to depart from the lodestar, were entirely disregarded by the district court in its final holdback order

below. By the time the Receiver sought a final distribution and release of the withheld fees and expenses at the end of the Receivership, the only *Johnson* factor that formed the basis of instituting the holdback—the "results obtained"—was conclusively established by the record.[13] The district court acknowledged as much, stating that "the ultimate financial condition of the Receivership has been ascertained, making this the appropriate time to approve payment of the professional fees and expenses held back since 2009." ROA.105520.

That result—"$2.18 billion to Investor CD Claimants," ROA.105520—was indisputably successful, especially given the bleak circumstances of the Estate when the Receiver was first appointed, *see* ROA.107643:23-25 (Receiver's counsel pointing out at the hearing below that "[n]o one is arguing . . . that 2.8 billion is an insufficient result obtained"). As one district court observed in a different multi-billion-dollar Ponzi-scheme case, something "north of a 30 percent recovery" for victims placed the receivership in that case "among the very top outcomes achieved in large fraud cases" and was a recovery rate that "far exceed[ed] the expectations that existed at the beginning of th[e] case." *United States v. Petters*, No. 08-5348,

[13] The "results obtained . . . are presumably fully reflected in the lodestar," *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (citation omitted), but that is only because attorneys' fees are "generally" calculated after such results become clear, *Blum v. Stetson*, 465 U.S. 886, 900 (1984). That was not possible in this case, of course, because the Receiver and his professionals were paid on an ongoing basis.

2021 WL 3883392, at *3 (D. Minn. July 29, 2021), *aff'd sub nom.*, *United States v. Kelley*, 70 F.4th 482 (8th Cir. 2023). The recovery rate here was north of *47%*. ROA.104249, 106510-11. Thus, even if the "results obtained" factor supported a provisional holdback in 2009 given the tenuous state of the Receivership at that time, it could not support departing downward from the lodestar in 2025 when the outstanding results obtained were fully realized.

The district court did not dispute that fundamental reality, but nonetheless awarded only half of the held-back fees and expenses. Rather than revisiting its lodestar determinations or re-evaluating the results obtained in light of the record, the district court simply declared that "a reduced award is equitable," because "18,000 victims of a large and complex scheme have waited fifteen years to recover their losses," while "the Receiver and his professionals have collected on a significant percentage of the total amount recovered in the form of interim fees." ROA.105521. In the district court's view, this "adjustment" to the Receiver's fees and expenses would "mitigate the harm the victims suffered." ROA.105521. Of course, none of this aligns with any of the *Johnson* factors and, therefore, was an erroneous basis for the district court's downward departure.

This rationale was an abuse of discretion for at least two reasons. First, and most obviously, the length of time the defrauded investors spent waiting to recover their losses, and the fact that the Receiver and his professionals were being partially

paid for ongoing work *on behalf of* those investors, are not *Johnson* factors. *See Johnson*, 488 F.2d at 717-19.[14] They bear no connection to the "results obtained" by the Receiver, nor to any other relevant consideration that this Court has identified under *Johnson*. Indeed, perhaps because the Examiner suggested that the *Johnson* factors were essentially irrelevant to the analysis, *see* ROA.107650:23-107651:9, the district court did not even purport to tie its reasoning to *Johnson* on this score, *cf. Torres v. SGE Mgmt., L.L.C.*, 945 F.3d 347, 354 (5th Cir. 2019) ("[W]e have little choice but to find that the district court abused its discretion in explicitly disclaiming use of the *Johnson* factors.").

Moreover, the district court's suggestion that "a reduced award is equitable based on the evidence" was not tied to any cited or discussed evidence, likely because there was no such evidence to cite on this record. ROA.105520-21; *see CH Offshore, Ltd. v. Mexiship Ocean CCC S.A. de C.V.*, 163 F.4th 171, 181 (5th Cir. 2025) ("[W]e find that the district court abused its discretion by failing to engage with the relevant evidence."). "[C]ourts of equity must be governed by rules and precedents, no less than courts of law." *Lonchar v. Thomas*, 517 U.S. 314, 323

[14] To be clear, the Receiver had little control over the pace of recoveries, and funds were distributed periodically throughout the sixteen-year period. In fact, the Receiver has made eleven court-approved distributions since 2013. ROA.50077-86, 54714-20, 63830-37, 74196-204, 80924-33, 83982-89, 86163-70, 89261-69, 92197-205, 98160-67, 99474-84.

(1996) (citation omitted). It follows that a court sitting in equity cannot merely "eyeball the fee request and cut it down by an arbitrary percentage"—precisely what the district court did here. *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1314 (7th Cir. 1996) (citation modified). Indeed, at the urging of the Examiner and SEC, the district court apparently viewed its equitable power as license to ignore the *Johnson* factors altogether, including the very factor the court set up as the sixteen-year litmus test for releasing the holdback. *See* ROA.107650:23-107651:9. Whatever equitable discretion the district court has, it cannot be divorced from the record and the applicable legal standard. *See U.S. Leather*, 60 F.3d at 229 (discretion limited by *Johnson* factors).

Second, the district court's "equitable" reduction of the lodestar was not even equitable on its own terms. There is nothing equitable about pitting against each other a receiver and the investors for whom he labored in a zero-sum contest for the Estate's assets. The order appointing the Receiver provides that he and his professionals are to be paid from Estate assets, ROA.652, similar to statutory bankruptcy cases, *see Barron v. Countryman*, 432 F.3d 590, 595 (5th Cir. 2005). Furthermore, the Receiver's wins were always the investors' wins. They each shared the success; the more assets the Receiver recovered through his efforts, the more investors were able to recover for their losses. That was the whole purpose of the district court's order appointing the Receiver. *See Janvey v. GMAG, L.L.C.*, 925

F.3d 229, 231 (5th Cir. 2019) (per curiam) ("The district court appointed Plaintiff-Appellant Ralph S. Janvey . . . to recover SIB's assets and distribute them to the scheme's victims."), *certified question answered*, 592 S.W.3d 125 (Tex. 2019).

Yet when it came time to fully compensate the Receiver for his and his professionals' work on behalf of the investors, the district court flipped the script. It erroneously accepted the SEC's and Examiner's arguments that compensation to the Receiver and his professionals and harm to the victims were moral equivalents, such that the district court should "favor" the victims by reducing the Receiver's and his professionals' compensation. *See* ROA.100407. But in no way does denying reasonable compensation to the Receiver and his professionals "mitigate the harm the victims suffered." ROA.105521. If that were the rule, then courts could always "mitigate the victims' harm" by drastically reducing the compensation of estate professionals after the fact. Why stop at a 10% or 20% reduction, when a 50% reduction of professional fees would mitigate victims' harm even more? Of course, that standardless discretion is not—and has never been—permitted. *See In re Midway Airlines, Inc.*, 383 F.3d 663, 669 (7th Cir. 2004) ("Among priority claims, administrative expenses receive the top priority.").[15]

[15] It is particularly rich that the SEC should sponsor such a position on this record. The SEC's own inspector general found that for ten years before the Receiver appeared on the scene, there was an opportunity to mitigate such harm to Stanford's victims, but the SEC failed to act. ROA.34175.

The district court's backward calculus of the equities in this case is illustrated well by the rules in the analogous bankruptcy context.[16] In bankruptcies, a neutral trustee is appointed to represent the debtor's estate, manage the estate's assets, identify assets that can be used for repayment to creditors, and even recover property through legal action, *see* 11 U.S.C. § 704(a)—many of the same things the Receiver has done in this case, *see SIBL*, 927 F.3d at 841 (observing that "the purpose of bankruptcy receiverships and equity receiverships is essentially the same" (citation modified)). Importantly, the bankruptcy trustee and his professionals are, by federal law, some of the very first persons paid out of the bankruptcy estate. *See* 11 U.S.C. §§ 328, 503(b)(1), 507(a)(1), 726(a). The "conceptual justification" for the trustee's payment priority status is straightforward: "creditors must pay for those expenses necessary to produce the distribution to which they are entitled." *In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998). Or, as the Ninth Circuit has put it, "[p]ayment of administrative expenses allows the debtor to secure goods and

---

[16] This Court and the district court have recognized that bankruptcies and receiverships are analogous in many respects. *See, e.g.*, *SEC v. SIBL*, 927 F.3d 830, 840-41 (5th Cir. 2019) ("Courts often look to the related context of bankruptcy when deciding cases involving receivership estates."); *SEC v. SIBL*, Nos. 3:09-CV-0298-N, 3:09-CV-0721-N, 2009 WL 10704900, at *1 (N.D. Tex. May 15, 2009) (Godbey, J.) ("Here the underlying case is a receivership, comparable in many respects to a bankruptcy proceeding.").

services necessary to administer the estate, which ultimately accrues to the benefit of all creditors." *In re DAK Indus.*, 66 F.3d 1091, 1097 (9th Cir. 1995).

The same conceptual justification applies equally to the Receiver in this case. The Receiver sought to maximize the assets of the Stanford Estate so that the defrauded investors could recover as much as possible. The work of the Receiver and his professionals helped "produce the distribution to which [the investors] are entitled," *H.L.S. Energy*, 151 F.3d at 437, and the Receiver's recovery of those assets "ultimately accrue[d] to the benefit of all [investors]," *DAK Indus.*, 66 F.3d at 1097. The Receiver and the investors were all on the same side. It was a win-win.

The district court's win-lose reframing that undergirded its lodestar departure is exactly the sort of "fee discretion" that Congress sought to eliminate in bankruptcy.[17] Before the relevant code amendments, "the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it

[17] The district court's decision to do exactly the opposite of what the Bankruptcy Code instructs is particularly notable given that the district court has previously observed in other Stanford-related proceedings that it would, when "interpreting receivership statutes, . . . consider analogous provisions in the United States bankruptcy code." *OSIC v. Am. Lebanese Syrian Associated Charities*, No. 3:11-CV-0303-N, 2015 WL 13739835, at *2 (N.D. Tex. July 22, 2015). As the district court has separately observed, "this particular receivership is the essential equivalent of a Chapter 7 bankruptcy." *Janvey v. Alguire*, No. 3:09-CV-00724-N, 2014 WL 12654910, at *18 (N.D. Tex. July 30, 2014), *aff'd*, 847 F.3d 231 (5th Cir. 2017) (per curiam).

had been done." *In re Nat'l Gypsum Co.*, 123 F.3d 861, 862 (5th Cir. 1997). Predictably, this *post hoc* "fee discretion began to dissuade professionals from offering their services to debtors," which is why "Congress passed section 328(a) of the bankruptcy code," allowing "professionals to have greater certainty as to their eventual payment." *In re Coho Energy Inc.*, 395 F.3d 198, 204 (5th Cir. 2004).[18] The same reasons counsel strongly against affording district courts overseeing receiverships the discretion to dilute reasonable compensation in the name of mitigating harm to victims.

Because the district court's order—premised on comparing the investors' delayed recovery to the Receiver and his professionals' interim recovery—is legally unsound insofar as it had no basis in *Johnson*, it should be reversed and an order

[18] Bankruptcy courts are also not strangers to the concept of a holdback, but none executes the concept in the anomalous way the district court did here. Bankruptcy courts in complex cases regularly approve procedures allowing payment of fees on a monthly basis (typically 80%) and formally approving payment of all requested fees, including the withheld 20%, quarterly. *See* Order, *In re Prospect Med. Holdings, Inc.*, No. 25-80002-sgj11 (Bankr. N.D. Tex. Feb. 12, 2025), Dkt. 608 at 2 (approving interim compensation procedures); 11 U.S.C. § 331 (allowing application for interim compensation). Unlike the district court, then, bankruptcy courts permit the release of held-back fees every several months. *See, e.g.*, Interim Fee App., *Prospect Med. Holdings*, No. 25-80002-sgj11 (Bankr. N.D. Tex. Apr. 27, 2025), Dkt. 1663 at 15; Order, *id.* (Bankr. N.D. Tex. May 22, 2025), Dkt. 2066 at 2 (awarding outstanding interim compensation); *In re Hunt*, 196 B.R. 356, 358 (N.D. Tex. 1996) (authorizing release of the holdback "every four months at a formal interim fee application hearing").

rendered in the Receiver and his professionals' favor for the full amount of the withheld fee, adjusted for delay.

4. *The district court's other reasons for departing downward from the lodestar were equally erroneous.*

"Additionally," the district court wrote, "a partial release of the holdback would recognize the equitable role Baker Botts played in achieving the various Stanford settlements that contributed to recovery." ROA.105521. "[S]everal other parties also must be given due credit," the district court continued, "including OSIC itself for its prosecution efforts, and where Baker Botts was only a nominal party." ROA.105521. Aside from this inexplicable reference to the Receiver's lead counsel as having an "equitable role" or being a "nominal party," this credit-based fee reduction is unsupported (and indeed contradicted) by evidence in the record and is therefore erroneous for that reason alone. *See* ROA.101070-72. Far from a nominal party, Baker Botts served as lead trial counsel and sole settlement negotiator *for OSIC* in the bank cases that resulted in $1.6 billion in recoveries for the Estate. ROA.101071. Likewise, credit unquestionably is warranted to the Receiver's other professionals, who also provided services *to OSIC* that were critical to the very "OSIC prosecution efforts" the district court deemed creditable.

That the district court slighted all the Receiver's professionals due to OSIC's "prosecution efforts" proves only the extent to which the district court disregarded the evidentiary record: Baker Botts represented OSIC and led those very efforts in

the Receivership's most successful litigation, made feasible also by the significant, critical efforts of the Receiver and his professionals. *See* Notice of Appearance, *Rotstain v. Trustmark Nat'l Bank*, No. 4:22-cv-00800 (S.D. Tex. Mar. 14, 2022), Dkt. 1159. The district court also ignored that the Receiver prosecuted scores of lawsuits that did not involve OSIC in any capacity, and that OSIC played no role in either winding up the Stanford empire or managing the claims and distributions process. *See* ROA.99532-39, 99559-62, 99567-68. Baker Botts unquestionably played a central role in this Receivership, including one that the Examiner admitted was "critical." ROA.107652:3-8. But Baker Botts and the professional service providers were not seeking an upward adjustment on this basis; they were not seeking an upward adjustment at all. They were simply asking to be paid a reasonable fee for their services—represented by the lodestar amount—in view of the exceptionally improved financial circumstances of the Receivership. Under these circumstances, no allocation of credit was necessary or appropriate.

The district court's departure from the lodestar on the ground that others also deserved some "credit" for the outcomes of certain lawsuits is also completely untethered to the *Johnson* factors. Indeed, none of the twelve *Johnson* factors affords the district court discretion to consider whether "due credit" ought to be given to OSIC or any of the other parties in the receivership. *See Johnson*, 488 F.2d at 717-19. The reason why is simple: assigning "credit" to various litigants or

counsel is a purely *post hoc* subjective opinion. The amount of time and effort that a particular lawyer or professional spent on a case—time and effort already found to be reasonable and necessary under *Johnson*—is all the "credit" that is relevant for purposes of the lodestar. *See Cruz*, 957 F.3d at 574. And in this case, the district court approved the number of hours spent by the Receiver and his professionals in achieving the various outcomes, including more than 50,000 hours spent assisting OSIC, and determined that these hours were compensable under the *Johnson* factors. *See* ROA.104293-94; *supra* p. 10. It was error for the district court to retroactively discount those hours at the end of the Receivership by assessing the "role," "efforts," and "credit" of the parties, ROA.105521. This is exactly the type of "impermissible double counting" of already-considered *Johnson* factors that is an improper basis for departing from the lodestar. *Saizan*, 448 F.3d at 800.

The myopic focus on Baker Botts' role in various litigation efforts to the exclusion of all other work performed by the professional firms only serves to highlight the arbitrary nature of the 50% across-the-board cut. The district court's erroneous Baker Botts-focused reasoning for its fee cut did not just negatively affect Baker Botts; the district court also implicitly applied it to *all* the Receiver's forty-four professional firms. The forty-three other professional firms provided critical accounting, forensic consulting, legal, and other services to the Receiver. *See*

ROA.99559-76.[19] Justifying the 50% across-the-board reduction based on a vague, unspecified portion of work performed by one professional firm and then using that work as a proxy to summarily evaluate the work of forty-plus other firms, shows just how far the district court strayed from the *Johnson* factors in favor of the whims of the SEC and Examiner. Indeed, cutting a professional firm's fees and expenses for reasons that have nothing to do with the specific work of that firm is, at its core, arbitrary. As the Seventh Circuit has observed, "the record ought to assure us that the district court did not eyeball the fee request and cut it down by an arbitrary percentage because it seemed excessive to the court." *People Who Care*, 90 F.3d at 1314 (citation modified).

The district court's preoccupation with "due credit"—at the invitation of the Examiner and SEC—was not a proper basis on which to reduce the Receiver's and his professionals' reasonable fees and expenses. On this additional basis, the district court's order should be reversed and rendered in the Receiver's and his professionals' favor for the full amount of the withheld fees and expenses, adjusted for delay.

[19] As this Court has previously recognized, for example, the work of the Receiver's forensic accounting professionals was particularly commendable, as it "provide[d] clear, numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme." *Alguire*, 647 F.3d at 597; *see also* ROA.32919.

5. *The district court's conclusory nod to the* Johnson *factors does not save the order.*

"The adjustment," the district court wrote, "accounts for the time spent, services performed, hourly rates charged, and expenses incurred by the Receiver and his professionals during the period covered by the [motion for release of the withheld fees and expenses] that were reasonable and necessary for the Receiver to perform his Court-ordered duties and justified under the *Johnson* factors." ROA.105521. This single boilerplate sentence does not somehow cure the district court's improper reliance on "equity," "mitigating investors' harms," and assigning "credit." *See* ROA.105521.

Nor can it overcome the district court's own orders on eighty-plus fee applications and sixteen-years' worth of evidence in the record, all finding the professionals' fees and expenses justified under the *Johnson* factors, subject only to a temporary holdback due to once-uncertain "results obtained." If anything, this reference shows that the district court was trying to justify its downward departure by double-counting *Johnson* factors subsumed in the lodestar—namely, the time spent, services performed, and rates charged. *See Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at 566 (holding that quality of counsel and their performance is already reflected in the hourly rate and "should not be used to adjust the lodestar"); *Pilgrim's Pride*, 690 F.3d at 659 (noting that the lodestar already accounts for the "complexity of the issues" and the "skill and experience of counsel" (quoting

*Fender*, 12 F.3d at 488)). Simply put, this conclusory statement does not unwind the stack of erroneous and arbitrary conclusions that animated the district court's order.

### B. The District Court erred by failing to adjust the held-back amounts for delay in payment.

#### 1. *Given the sixteen years' worth of delayed payment, a CPI-based adjustment was necessary to ensure the fees awarded were reasonable.*

Circuit precedent provides that CPI-based delay adjustments are part of a reasonable fee for the Receiver and his professionals. Indeed, an adjustment for delay was necessary to award the professionals a reasonable fee, but the district court improperly brushed aside this request using the same "victims" versus "professionals" rationale found throughout its decision.

"[C]ompensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings." *Missouri v. Jenkins ex rel. Agyei*, 491 U.S. 274, 283-84 (1989). This is because "payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable." *Graves v. Barnes*, 700 F.2d 220, 223 (5th Cir. 1983) (citation modified (quoting *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980))). Thus, an adjustment for delay in payment is part of a reasonable attorney's

fee. *Jenkins*, 491 U.S. at 282. And, this Court has specifically recognized that an adjustment for delay in payment is appropriate in the context of a long-running receivership-turned-bankruptcy. *In re Lawler*, 807 F.2d at 1212 (citing *Graves*, 700 F.2d at 224) (applying "current hourly rates" to "compensate[ the estate's attorneys] for the delay in payment").

There can be no dispute that the Receiver's professionals have been subject to a significant delay in payment—delay that has dramatically diluted the value of those held-back fees and expenses. For example, the district court held back $5,490,738.24 in 2009—20% of the fees and expenses requested—from the Receiver's first two fee applications. ROA.104654. Fifteen years and eleven months later, those held-back payments remained unpaid and were worth $8,159,237.02 at the time of the Receiver's request. ROA.104657.[20] So, even if the district court had fully awarded the holdback without a delay adjustment, the professionals would be paid the equivalent of $2,668,498.78 less—32.7% less—than if the district court had simply approved payment of those fees and expenses at the time the fee applications were approved. Because "payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime," *Graves*, 700 F.2d at 223 (citation modified), awarding

[20] As calculated using the CPI-U South rates in effect as of June 2025. ROA.104654; *see* ROA.104279 n.13.

old, then-lodestar amounts without a delay adjustment deprives professionals of a reasonable fee. The district court should have adjusted the holdback award for delay in payment.

2. *The Receiver's request that the district court adjust the holdback using the CPI-U South was appropriate, and neither the SEC nor the Examiner objected to this method.*

Under the law, an adjustment to compensate for deferred payment may be calculated "either by [(1)] basing the award on current rates or by [(2)] adjusting the fee based on historical rates to reflect its present value." *Perdue*, 559 U.S. at 556 (quoting *Jenkins*, 491 U.S. at 282); *see also Walker v. U.S. Dep't of Hous. & Urb. Dev.*, 99 F.3d 761, 773 (5th Cir. 1996) ("In compensating for a delay, the district court may either grant an unenhanced lodestar based on current rates or calculate the lodestar using the rates applicable when the work was done and grant a delay enhancement. It may not do both." (citations omitted)); *Soler v. G & U, Inc.*, 801 F. Supp. 1056, 1067 (S.D.N.Y. 1992) ("delay may be compensated in a number of different ways, depending on whether the award was based on current or historical hourly rates").

The holdback was calculated as a percentage reduction of fees and expenses from the Receiver's fee applications. *See, e.g.*, ROA.19233 (authorizing payment of 65% of the Receiver's third fee application and inviting the Receiver to "apply for the remaining 35% . . . at a later date"). The amounts requested in those

applications were calculated by multiplying the reasonable hours spent by the existing rates at the time of each fee application. *See supra* Part II.A. The Receiver requested that the district court adjust those existing, calculated amounts to their present value rather than recalculate the holdback using present rates. ROA.104277-80 & n.12. Under this approach, "adjusting the fee based on historical rates to reflect its present value," *Perdue*, 559 U.S. at 556, "requires a separate accounting for inflation by using the Consumer Price Index ["CPI"], the prevailing interest rate, or an increase of the lodestar figure," *Soler*, 801 F. Supp. at 1067.

This Court has recently used the CPI for the U.S. South Region to calculate the present value of historical statutory rates when calculating an appropriate fee award. *See Nkenglefac v. Garland*, 64 F.4th 251, 254-55 (5th Cir. 2023) (granting application for attorneys' fees and noting that "in the absence of more specific data, we apply the CPI-U for the South"). The Receiver thus calculated the present value of the holdback from the month each fee application was approved using the CPI-U South Index. ROA.104279-80. Neither the district court nor any party disputed the Receiver's adjustment calculation. Accordingly, the district court should have adjusted the held-back amounts using the CPI-U South and awarded payment in the Receiver's requested amounts.

3. *The district court's refusal to make a CPI-based adjustment to the held-back fees was legally erroneous.*

The district court erred by holding, without citation to any authority, that precedent related to delay in payment "is inapplicable in the current context where the recovery is shifted from the *victims*." ROA.105521 (emphasis in original). Along the same lines, the district court criticized the Receiver's requested adjustment because it "does not account for any adjustment to the CD Claimants." ROA.105521.

The district court's juxtaposition of professionals versus victims is inapt because the methods for determining reasonable compensation for professionals' work and distributions to Ponzi scheme claimants are based on entirely different legal standards. *Compare Pilgrim's Pride*, 690 F.3d at 655 (discussing legal requirements for evaluating award of professionals' fees), *with Janvey v. Brown*, 767 F.3d 430, 442, 443 n.76 (5th Cir. 2014) (noting that "Ponzi scheme victims have claims for damages in the amount of their original investment," and thus had "no claim for contractual interest from a Ponzi scheme").

Moreover, the law belies the notion that awarding administrative fees and expenses harms investor-creditors. *See supra* Part II.A at pp. 36-41. To the contrary, it is "widely accepted" that administrative expenses are paid first "[w]here a receiver is presented with competing claims to property. . . ." *SEC v. Megafund Corp.*, No. 3-05-CV-1328-L, 2007 WL 1099640, at *2 (N.D. Tex. Feb. 14, 2007) (citing 3

Ralph Ewing Clark, *Treatise on the Law and Practice of Receivers* § 667 at 1197, 1198 (3d ed.1959)). The order appointing the Receiver enshrined this principle, recognizing that the professionals would be paid from Estate assets. ROA.652. Simply stated, there is no basis for the district court's conclusion that the professionals' right to payment from assets of the Estate justifies a refusal to pay reasonable compensation—whether through denying delay adjustments or otherwise. Indeed, the law demands the contrary.

Nor are delay adjustments limited to fee-shifting cases, as the district court implied. Indeed, this Court approved a delay adjustment in a receivership-turned-bankruptcy and did so while citing a fee-shifting case. *Lawler*, 807 F.2d at 1212 (citing *Graves*, 700 F.2d at 224 (appeal of fee award by State of Texas in voting rights case)) (applying "current hourly rates" to "compensate[ the estate's attorneys] for the delay in payment"). The crux of these cases is not whether fee-shifting is involved, but instead whether the attorney is required to submit a detailed fee application for court approval and whether there is significant delay in payment for work performed. There would be no court-imposed holdback if the Receiver were not required to request payment from the district court, and no private client would have the privilege of continuing to receive professional services after falling tens of millions of dollars in arrears for more than a decade.

The district court also erroneously distinguished *Lawler* because counsel for the receiver-turned-trustee in *Lawler* was owed "*considerably* more." ROA.105522. That statement is both inaccurate and irrelevant. First, in *Lawler*, the unpaid, unadjusted lodestar amount was $843,401.75 for 5,693.95 hours of work. *Lawler*, 807 F.2d at 1211 & n.2. Here, the unpaid, unadjusted lodestar amount included $29,833,810.90 in withheld fees—a figure representing varying percentages of more than 540,000 hours of work already billed to the Receivership, ROA.104659, and $1,650,207.60 for 5,678 hours preparing fee applications, ROA.104652.[21] Second, nothing in *Lawler* suggests that the principle of compensation for delay is limited to amounts of a certain magnitude. In this case, the Receiver requested an adjustment for only the unpaid amounts from each fee application, and the requested adjustment is individually tailored to account for the amount of time each balance has gone unpaid.

Finally, the district court appeared to hold that professionals can only be "pai[d] commercially acceptable rates" where "creditors ha[ve] been paid in *full*." ROA.105522. The district court's cited authority holds no such thing. Instead, it says "[w]here, as here, the estate contains sufficient resources to compensate the

[21] The district court's statement that the Receiver's professionals have collected 80-90% of their billings, ROA.105522, is just mistaken as a matter of fact. For example, the professionals only collected 65% of the substantial third and fourth fee applications. ROA.19233.

Receiver and his attorney at commercially acceptable rates for services of considerable benefit to defendant, it would be unreasonable not to do so." *SEC v. W. L. Moody & Co., Bankers (Unincorporated)*, 374 F. Supp. 465, 487 (S.D. Tex. 1974), *aff'd*, 519 F.2d 1087 (5th Cir. 1975) (unpublished table decision). Here, too, the Estate contains sufficient resources to compensate the Receiver and his professionals at discounted and commercially acceptable rates while still distributing $2.18 billion, or 47.4%, to all of Stanford's defrauded investors. ROA.105520. The Receiver is not seeking an enhancement of the lodestar; he asks only that unpaid lodestar amounts be adjusted to their present value to compensate for the time those amounts remained unpaid. The district court's holding that the lodestar, the presumptively reasonable fee, can only be paid where creditors receive a 100% recovery has no basis in the law.

The district court should have awarded a reasonable fee that included a CPI-based adjustment to the held-back amounts, resulting in an award totaling $40,890,050.76. ROA.104278-79. Its failure to do so was erroneous, warranting reversal and rendition in the Receiver and his professionals' favor.

### C. The district court erred in refusing to compensate Baker Botts for preparing the Receivership's numerous and detailed fee applications.

It is undisputed that a "professional's preparation of a fee application is best understood as a 'service rendered' to the estate." *Baker Botts L.L.P. v. ASARCO*

*LLC*, 576 U.S. 121, 132 (2015) (citation modified). Thus, "[i]t is well settled law that the time spent on an attorney's fee application is compensable." *Soler*, 801 F. Supp. at 1064. In the analogous bankruptcy context, this Court has "long required an attorney to file a detailed account of the legal services he provided the bankrupt in order to recover any compensation at all for his services." *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1093 (5th Cir. 1980) (per curiam). Accordingly, "[i]t would be unduly penurious to require such an accounting without granting reasonable compensation." *Id.* For that reason, a "district court abuse[s] its discretion in awarding no compensation" for the preparation of fee applications. *Id.* But that is exactly what the district court did.

Just as in *Rose Pass Mines*, Baker Botts' work preparing the Estate's fee applications was both required by the court and a service to the Estate. *See* ROA.652 (the district court order requiring detailed fee applications as a prerequisite to compensation). No one disputes that Baker Botts' efforts in creating those fee applications benefited the Estate and district court. Piecemeal fee applications by forty-four firms would have wasted the court's time and created chaos on the district court's docket. And the Receiver's lead counsel would have been involved in any event to ensure that the various professionals' work was described in a way that did not divulge the Receiver's confidential information or otherwise impair the Receiver's ongoing litigation strategy. Baker Botts' composite fee applications

provided standardized and efficient compensation procedures for the court. *See* ROA.104295.

In the bankruptcy context, this work is explicitly compensable under *Rose Pass Mines*, 615 F.2d at 1093, and 11 U.S.C. § 330(a)(6). True, the Code is not binding here, but in the words of the district court, "the underlying case is a receivership, comparable in many respects to a bankruptcy proceeding." ROA.6651. Strong justification would be needed to deny compensation for identical work in the analogous receivership context. No such justification exists on this record.

Instead, the district court cited only the SEC's and Examiner's argument based on "SEC Billing Instructions," which the SEC claims apply in some receiverships. That document states "receivers cannot bill for time spent preparing and submitting fee applications." ROA.105522. Reliance thereon was error.

Even published, notice-and-comment regulations, which these "Billing Instructions" are not, do not displace the judicial duty to say what the law is. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). These "Billing Instructions" are not the law and deserve no deference from this Court. As is evident from the face of the document, the Instructions represent a generic form proposed agreement—between a receiver and the SEC. ROA.100437 ("the undersigned represents, if appointed receiver in a civil action"). But there is no evidence, nor even an argument from the SEC, that the Receiver or Baker Botts, his counsel, ever

saw—let alone agreed—to those "instructions." Indeed, there are numerous examples of other "instructions" that were never applied to this Receivership. ROA.100439-40 (requiring each application to include "the dates of previous orders on interim Applications" and the SEC's "Standardized Fund Accounting Report . . . [to] be attached to any fee application as 'Exhibit A'," etc.). The SEC Billing Instructions do not supplant the well-established rule that fee-application work benefits the estate and the district court and is therefore compensable. *Rose Pass Mines*, 615 F.2d at 1093.

Baker Botts attorneys and staff have spent 5,678 hours over sixteen years preparing the Receivership's numerous, lengthy, and detailed fee applications. ROA.104652.[22] At the steeply discounted rates approved by the district court, the reasonable fee for this work is $1,650,207.60. ROA.104280.[23] The only evidence presented to the district court established that the time spent, and rates charged, were reasonable. ROA.104296-97. Therefore, the district court should have approved

[22] Baker Botts only seeks compensation for the preparation of the Estate's fifth through eighty-second fee applications, which corresponds to the period following the district court's guidance on billing procedures and other requirements for the Receiver's fee applications. *See* ROA.106704:8-106705:10.

[23] This figure represents an average $290.63 per hour for time spent preparing fee applications and does not include more than 1,500 hours spent responding to the Examiner's and SEC's 1,000-plus detailed questions about the fee applications. ROA.104280 n.15.

payment for Baker Botts' work preparing the Receivership's fifth through eighty-second fee applications, adjusted to $2,123,520.20 to account for delay in payment.

## CONCLUSION

The Court should reverse each of the district court's erroneous rulings and render judgment for the full amount of the withheld fees, adjusted for delay, along with compensation for preparing the fee applications.

Dated: March 23, 2026

Respectfully submitted,

By: */s/ Kimberly A. Chojnacki**
Kimberly A. Chojnacki
Texas Bar No. 24068696
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
1301 McKinney Street, Suite 3700
Houston, Texas 77010
T: (713) 650-9700
kchojnacki@bakerdonelson.com

Steven F. Griffith, Jr.
Louisiana Bar No. 27232
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
201 St. Charles Ave., Suite 3600
New Orleans, Louisiana 70170
T: (504) 566-5200
sgriffith@bakerdonelson.com

*Attorneys for Appellant*
*FTI Consulting, Inc.*

By: */s/ Michael W. Stockham**
Michael W. Stockham
Texas Bar No. 24038074
HOLLAND AND KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
T: (214) 696-2515
michael.stockham@hklaw.com

*Attorneys for Appellant*
*Holland and Knight LLP*

By: */s/ Kevin M. Sadler*
Kevin M. Sadler
Texas Bar No. 17512450
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304-1007
T: (650) 739-7500
kevin.sadler@bakerbotts.com

Aaron M. Streett
Texas Bar No. 24037561
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002-4995
T: (713) 229-1855
aaron.streett@bakerbotts.com

Scott D. Powers
Texas Bar No. 24027746
Andrew B. Swallows
Texas Bar No. 24125710
Daniel B. Rankin
Texas Bar No. 24116940
BAKER BOTTS L.L.P.
401 South 1st Street, Suite 1300
Austin, Texas 78704-1296
T: (512) 322-2500
scott.powers@bakerbotts.com
andrew.swallows@bakerbotts.com
daniel.rankin@bakerbotts.com

*Attorneys for Appellants*
*Ralph S. Janvey, Krage & Janvey, L.L.P.,*
*Baker Botts L.L.P., and*
*H. Malcolm Lovett, Jr.*

By: */s/ Marianne W. Nitsch**
Marianne W. Nitsch
Texas Bar No. 24098182
Mark Stahl
Texas Bar No. 24125420
GRAVES, DOUGHERTY, HEARON & MOODY, PC
401 Congress Ave., Suite 2700
Austin, Texas 78701-3736
T: (512) 480-5757
mnitsch@gdhm.com
mstahl@gdhm.com

*Attorneys for Appellant*
*Osler, Hoskin & Harcourt LLP*

By: */s/ Lindsey Cohan **
Lindsey Cohan
Texas Bar No. 24083903
DECHERT LLP
106 E 6th St Suite 900-119
Austin, Texas 78701
T: (512) 394-3027
lindsey.cohan@dechert.com

Allyson E. Riemma
Texas Bar No. 24147403
DECHERT LLP
444 West Lake Street, Suite 2100
Chicago, Illinois 60606
T: (312) 646-5800
allyson.riemma@dechert.com

*Attorneys for Appellant*
*BDO USA, P.C.*

By: */s/ Cathy A. Fleming**
Cathy A. Fleming
New Jersey Bar No. 016311987
FLEMING RUVOLDT PLLC
779 Closter Dock Road
Closter, New Jersey 07624
T: (201) 518-7907
cfleming@flemingruvoldt.com

*Attorneys for Appellant*
*Financial Industry Technical Services, Inc.*

** signed by permission*

*Counsel for Appellants Ralph S. Janvey, Receiver; Baker Botts L.L.P.; FTI Consulting, Incorporated; Holland & Knight, LLP; Financial Industry Technical Services, Incorporated; BDO USA, L.L.P.; Krage & Janvey, LLP; Osler, Hoskin & Harcourt, LLP; and H. Malcolm Lovett, Jr.*

## CERTIFICATE OF SERVICE

I certify that on March 23, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Kevin M. Sadler*
Kevin M. Sadler

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,956 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font. This brief was scanned for viruses and none were present.

*/s/ Kevin M. Sadler*
Kevin M. Sadler